GEORGANNE W. BRADLEY (NSB 1105)
KAEMPFER CROWELL RENSHAW
GRONAUER & FIORENTINO
3800 Howard Hughes Pkwy., Seventh Floor
Las Vegas, NV  89169
Telephone: (702) 792-7000
Facsimile:  (702) 796-7181
Email:      gbradley@kcnvlaw.com

Attorneys for Debtor and Debtor in Possession,
FSG-R, LLC

E-FILED ON MARCH 17, 2011

I. SCOTT BOGATZ (NSBN 3367)
BOGATZ & ASSOCIATES, P.C.
3455 Cliff Shadows Parkway, Suite 110
Las Vegas, Nevada 89129
Telephone: (702) 776-7000
Facsimile: (702) 776-7900

ROBERTO J. KAMPFNER
(admitted *pro hac vice*)
WHITE & CASE LLP
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone:  213-620-7700
Facsimile:   213-452-2329

Attorneys for
FOCUS SOUTH GROUP, LLC

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA (LAS VEGAS)**

| | |
|---|---|
| In re:<br>FSG-R, LLC, a Nevada limited liability company,<br>              Debtor(s). | Case No. 09-30126-LBR<br><br>Chapter 11 |
| FSG-R, LLC, a Nevada limited liability company and FOCUS SOUTH GROUP, LLC, a Nevada limited liability company,<br>              Plaintiffs<br><br>vs.<br><br>THE CITY OF HENDERSON<br>              Defendant. | Adversary Proceeding No. [_____]<br><br>**ADVERSARY COMPLAINT OF DEBTOR AND FOCUS SOUTH GROUP, LLC FOR (A) DECLARATORY RELIEF THAT CERTAIN LID ASSESSMENTS ARE ILLEGAL AND UNENFORCEABLE, (B) IF THE COURT FINDS THAT SUCH ASSESSMENTS ARE INVALID BUT SHOULD NOT BE ZERO, AN ORDER REDUCING THE ASSESSMENTS AS REQUIRED BY LAW, AND (C) DISALLOWANCE OF THE CITY OF HENDERSON'S CLAIM AGAINST THE DEBTOR** |

**INTRODUCTION**

Plaintiff FSG-R, LLC, the debtor and debtor in possession in the above-captioned adversary proceeding (the "Debtor") and Focus South Group, LLC, the parent of the Debtor ("Focus," and, together with the Debtor, the "Plaintiff"), each respectfully allege as follows:

**NATURE OF THE ACTION**

1.  This action for declaratory judgment and other relief is brought pursuant to sections 1334(b) and (e), 2201, and 2202 of title 28 of the United States Code; section 105(a) and section 505(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"); and Rules 7001(2) and (9) of the Federal Rules of Bankruptcy Procedure.

2.  This action involves a dispute over the validity and enforceability of certain assessments levied by the City of Henderson (the "Defendant," or "City") on the Debtor's real property. The Debtor's real property is located within "Inspirada," a master planned community being developed by South Edge, LLC ("South Edge") that was to consist of seven residential "Villages" and a Town Center. The assessments were issued in connection with the creation of Local Improvement District No. T-18 (the "LID") and were intended to pay for certain infrastructure such as roads and utilities that would benefit of the property located within the Inspirada villages. The Debtor's real property is located in Village 5 and Village 6, among the last of the villages scheduled to be improved with infrastructure funded by the LID assessments.

3.  In March 2008, prior to the construction of any infrastructure benefiting the Debtor's land, certain members of South Edge, in violation of the South Edge operating agreement, abruptly caused South Edge to cease building infrastructure. As a result, none of the infrastructure promised to the Debtor in connection with the LID has been built. Further, as of the date hereof, it is unclear, and, indeed, unlikely, that such infrastructure will ever be built. The Inspirada project has been stalled for over three years, South Edge has defaulted on its loans and been placed into bankruptcy by its lenders, and the entire Inspirada project has been mired in litigation.

4.  Notwithstanding the foregoing, the City has indicated that it has a secured claim of approximately $1.2 million against the Debtor for nonpayment of assessments, and has filed a

1  motion for relief from the automatic stay to exercise remedies and foreclose upon the Debtor's
2  real property.  The City has no right to do so.  Nevada law is clear that LID assessments (and any
3  liens securing such assessments) are not enforceable in cases where no promised infrastructure
4  has been built.  That is exactly the case here.  At the very least, Nevada law requires that the LID
5  assessments be dramatically reduced to reflect the failure to build infrastructure.

6        5.      The Plaintiff has filed this action to prevent the City from wrongfully and
7  improperly collecting the unenforceable and overstated LID assessments described above.  The
8  Court should (a) rule that the LID assessments are invalid and unenforceable because no
9  infrastructure has been built for the benefit of the Debtor's land, (b) if the Court rules that the
10 Assessments are illegal but should not be reduced to zero, reduce the LID assessments to the level
11 permitted by Nevada law, and (c) disallow the City's claims against the Debtor on account of the
12 LID assessments.

13       6.      For the reasons set forth below, the relief requested herein should be granted.

14 **JURISDICTION AND VENUE**

15       7.      This Court has jurisdiction over this adversary proceeding pursuant to
16 sections 157(a) and 1334 of title 28 of the United States Code.

17       8.      Venue is proper in this Court pursuant to sections 1408 and 1409(a) of title 28 of
18 the United States Code.

19       9.      This adversary proceeding is a core proceeding pursuant to section 157(b)(2)(A),
20 (B), (K) and (O) of title 28 of the United States Code.  In addition, the City has consented to the
21 core jurisdiction of this Court over this matter by, among other things, filing a motion for relief
22 from stay to foreclose upon Plaintiff's property for purported nonpayment of the Assessments.
23 Accordingly, this Court may enter a final adjudication on the merits of this case.

24 **PARTIES**

25       8.      FSG-R, LLC, a plaintiff in this action, is a limited liability company duly
26 organized under the laws of the State of Nevada and a debtor and debtor in possession in the
27 Bankruptcy Case.
28

- 3 -

1    9.    Focus South Group, LLC, a plaintiff in this action, is a limited liability company duly organized under the laws of the State of Nevada, and is the parent of the Debtor.

10.   The City of Henderson, the defendant in this action, upon information and belief, is a municipality located in the State of Nevada, Clark County.

## FACTS

**A.    General Background**

11.   The Debtor is a wholly owned subsidiary of Focus.  In 2004, Focus, along with KB Home Nevada, Inc. ("KB"), Coleman-Toll Limited Partnership, LLC ("Toll"), Pardee Homes of Nevada, Beazer Homes Holding Corp., and MTH Homes Nevada, Inc. (collectively, and excluding Focus, the "Builders"), and two companies that have filed chapter 11 proceedings, Kimball Hill Homes Nev., Inc. and Alameda Investments, LLC, formed South Edge for the purpose of purchasing approximately 1,940 acres of real property (the "Property") in Henderson, Nevada.

12.   Later, the members of South Edge (collectively, the "Members" and each a "Member") agreed that South Edge also would develop a master planned community to be known as "Inspirada" on the Property.  To this end, South Edge would be responsible for building "Major Infrastructure," such as major roads, water lines, sewers and utilities on the Property in connection with the Inspirada project.

13.   The Property was auctioned by the Bureau of Land Management in May 2004.  South Edge was the prevailing bidder at the auction and closed the sale of the Property on November 1, 2004.

14.   The Inspirada development is essentially a small city, comprised of seven residential villages of approximately 200 acres each, and an almost 400-acre Town Center.  The total projected cost of the master planned development, including land acquisition, development and financing costs, is approximately $1.2 billion.  The villages were to be built sequentially, with "Village 1" to be built first and "Village 7" to be built last.  Town Center was to be built in conjunction with the Villages to provide commercial space for Village residents.

//

- 4 -

**B.     The Financing of the Project and the LID**

15.     The Inspirada project was to be financed from several sources. First, South Edge obtained loans (the "Loans") from a syndicate of lenders for which JPMorgan Chase Bank, N.A. served as administrative agent (the "Administrative Agent"). The principal amount of the Loans was originally $535 million, but that amount was later increased to $585 million. The bulk of the proceeds of the Loans were used by South Edge to acquire the Property from the BLM. Second, the Members agreed to contribute capital to South Edge for the purpose of building infrastructure and funding certain project "soft" costs. Finally, the City formed the LID to help finance the construction of Major Infrastructure in and for the benefit of the Villages.

16.     The Loans incurred by South Edge were to be repaid through a process known as a "takedown." In short, after the Property was acquired, South Edge divided the Property into "Pods" and allocated the Pods to its Members based on each Member's percentage interest in South Edge. The Member was then obligated to "purchase" or "take down" the Pod on a date certain and for a set price. The proceeds of the takedowns were then used by South Edge to repay the Loans. The Members were also required to post a "Major Infrastructure" or "MI" Deposit concurrently with the takedown of their respective Pods. The MI Deposit, held in the name of the Member, not South Edge, essentially prefunded each Member's share of the cost of the Major Infrastructure South Edge was required to build.

17.     Importantly, South Edge is not responsible for building homes or commercial buildings in Inspirada. The individual Members are responsible for those tasks and may build homes or commercial buildings consistent with the Inspirada master plan *after* taking down their land from South Edge. South Edge is responsible for building "Major Infrastructure," which is, ultimately, critical to allowing the Members to develop their land.

18.     In addition to the Members' MI Deposits, on April 4, 2006, by Ordinance No. 2456, Defendant created the LID to fund Major Infrastructure for the Villages. In short, South Edge (with funds from the MI Deposits and other sources) would build roads, water lines, sewers and utilities for the benefit of the Property within the LID (*i.e.*, the "Village Land"). The City

1 would then purchase such infrastructure from South Edge when it was completed, and would be
2 responsible for maintaining such infrastructure going forward.

3   19.   After creating the LID, the City issued and sold $102 million in bonds (the
4 "Bonds"). The net proceeds from the sale of the Bonds were put in an account (the "LID
5 Account") held by the City to be used to purchase infrastructure as it was completed by South
6 Edge.

7   20.   The Bonds are payable from the proceeds of and secured by assessments (the
8 "Assessments") levied on the owners of property within the LID, including the Debtor.

9   21.   Had everything worked as intended, the Members would have taken down their
10 Pods in the Villages from South Edge when due and funded their respective MI Deposits; South
11 Edge would have built infrastructure for the benefit of the land in such Villages with such
12 deposits and other funds; the City would have purchased such infrastructure with proceeds from
13 the Bonds (*i.e.*, the funds located in the LID Account), thereby reimbursing South Edge for the
14 construction of Major Infrastructure; the Members would have either constructed homes on the
15 Pods, or sold the Pods to developers for such purposes; and the homeowners purchasing homes
16 in the Villages would have paid the Assessments to repay the Bonds. Ultimately, as
17 contemplated by Nevada law, the homeowners that purchased homes in the Villages (or other
18 owners of land in the Villages) would have benefited from the infrastructure built by South Edge
19 and would have paid for that benefit through the Assessments. That is not what happened.

**C.   The Defaults Begin**

22.   On October 25, 2007, Focus took down all its land at a cost of approximately $92
million. Focus also deposited approximately $30.7 million into its MI Deposit to build Major
Infrastructure. By taking down its land and fully funding its MI Deposit, Focus complied with
all of its obligations to South Edge and the Builders to take down land and pre-fund
infrastructure. One of the Pods Focus purchased is located in Village 5. Another is located in

Village 6. Such Pods are referred to collectively herein as the "<u>Village Land</u>." The Debtor is a special purchase entity created for the purpose of holding the Village Land.[1]

23. Focus's purchase of the Village Land through the Debtor was financed through a loan from Kennedy Funding, Inc. ("<u>Kennedy</u>"). Kennedy loaned the Debtor approximately $25 million to acquire the Village Land and secured such loan with a lien thereon along with an assignment of rents.

24. After Focus fully performed its obligations to South Edge, the Builders refused to do the same. Among other things, starting in February 2008, the Builders failed to contribute capital to South Edge for the purpose of paying interest on the Loans, and failed to make their respective takedowns when due. Further, the Builders caused South Edge to stop developing Inspirada in March 2008, thereby preventing the construction of Major Infrastructure. These actions constituted defaults under the loan documents evidencing the Loans and under the South Edge operating agreement. As a result of the foregoing, the Lenders placed South Edge in default of the Loans.

25. At the time that the Builders stalled the Inspirada project, Major Infrastructure had been largely completed in Village 1, and homes are currently being sold in Village 1 at this time, mostly by KB and Toll. Focus owns no land in Village 1. Infrastructure work had begun but was not finished in Village 2 (Focus owns no land in Village 2), and Villages 4 through 7 had no access of any kind to Major Infrastructure. Accordingly, the "Village Land" does not benefit from any Major Infrastructure at this time, despite the fact that the Assessments were levied exactly for such purpose.

26. The Builders' stalling of the Inspirada project resulted in the cessation of substantially all construction of Major Infrastructure in March 2008, well before much of the planned infrastructure had been built. As a result, a substantial portion of the Bond proceeds have not been disbursed to South Edge and remain in the LID Account. Indeed, as of the date

---

[1] Focus affiliates other than the Debtor also purchased land in Town Center. Such land is not within the LID and is not the subject of these proceedings.

- 7 -

hereof, the balance of the LID Account is approximately $92 million. It is unclear whether such amount will ultimately be refunded to the holders of the Bonds.

**D.    Focus's Response to the Defaults**

27.    Focus is not responsible for the cessation of the Inspirada project. Indeed, Focus is the only Member to have taken down all of its land from South Edge and fully funded its MI Deposit as required by South Edge's operative documents, including the South Edge operating agreement. Further, Focus has always maintained that the Builders should immediately cure their defaults to South Edge and complete the Inspirada project. Throughout 2008 and 2009, after the Builders had stopped development of Inspirada, the Builders claimed that they had every intention of restarting the project, but needed to restructure the Loans first. The Builders requested that Focus forbear from exercising remedies in order to permit the restructuring process to run its course. Focus initially honored the Builders' requests; however, in late 2009 it became clear that the restructuring process had failed, the Lenders had run out of patience, and the Builders had no intention of restarting the project in the near future. Among other things, the Lenders sued the Builders in December 2009 in federal court to enforce certain completion guaranties and to enforce certain rights of South Edge against the Builders in which the Lenders claim a lien.[2] The Builders, in turn, appeared to be preparing for a protracted litigation battle.

28.    Faced with the Builders' intransigence and failure to honor their respective obligations to South Edge and Focus, Focus commenced an arbitration proceeding on behalf of itself and South Edge in May 2009, primarily seeking specific performance of the Builders' obligations, including the Builders' obligations to make takedowns and fund Major Infrastructure. Focus also sought money damages as an alternative remedy. Focus hoped that the arbitration proceeding would force the Builders to restart the project, which, among other things, would result in the building of infrastructure to benefit the Village Land. The Builders

---

[2] The actions to collect on the completion guaranties were originally filed by the Lenders in New York and subsequently transferred to Nevada. The actions claiming to enforce South Edge's claims against the Builders were filed in Nevada in the first instance. Such cases have been consolidated for administrative purposes into a single case styled *JPMorgan Chase Bank, N.A. v. KB Home, et. al.*, Base File Doc. 2:08-CV-01711-PMP-RJJ (D. Nev.).

contested Focus's right to any form of arbitration. The United States District Court for the District of Nevada (the "District Court"), however, ordered the parties to arbitration on July 15, 2009 and appointed a distinguished panel of three former Nevada judges to hear the case.[3]

29. At the conclusion of the arbitration proceedings, the panel found that the Builders had indeed breached their obligations to South Edge and Focus to complete Inspirada, but declined to order specific performance, awarding Focus certain monetary damages instead. Accordingly, the arbitration was not successful in restarting the project.

30. Since then, the prospects for Inspirada's completion have become only bleaker. On December 9, 2010, JPMorgan, in its capacity as Lender to South Edge, together with Credit Agricole Corporate and Investment Bank and Wells Fargo Bank, N.A., filed an involuntary chapter 11 petition (the "Petition") against South Edge pursuant to section 303 of the Bankruptcy Court in this Court. During the trial, the City's assessment engineer, Manny Gomez, indicated that, in his opinion, the Assessments were unenforceable against property owners such as the Debtor that had received no benefit from Major Infrastructure as a result of the collapse of the Inspirada project. Mr. Gomez also indicated that the Assessments would have to be substantially reduced if the Major Infrastructure promised to such owners in exchange for the LID was not completed.

31. The Petition was granted, and an order for relief under chapter 11 was entered on February 3, 2011. Cynthia Nixon, from FTI Consulting Group, has been appointed as the chapter 11 trustee to oversee South Edge's chapter 11 case.

32. As of the date hereof, the Inspirada project remains stalled and the Village Land does not have the benefit of any Major Infrastructure. Further, it is, at best, unclear whether any such infrastructure will ever be built. As noted above, the Builders have refused to make their takedowns and fund their MI Deposits, South Edge is in default under the terms of the Loans and is currently in a chapter 11 proceeding and a chapter 11 trustee has been appointed to oversee South Edge's assets.

---

[3] The arbitration panel consisted of two retired Nevada Supreme Court judges, Robert E. Rose and A. William Maupin, and a retired United States District Court judge, David Warner Hagen.

**D.    The City's Purported Claims and Liens**

33.    Notwithstanding the foregoing, including the fact that the Village Land has received none of the infrastructure the Assessments were intended to provide, the City has asserted a claim against the Debtor in the amount of $1,237,458.67 for past due assessments. Further, on February 11, 2011, the City filed a motion for relief from stay against the Debtor seeking to foreclose upon the Village Land as a result of such nonpayment. As noted below, the Assessments are unenforceable because the infrastructure that they were supposed to finance has not been built.

**E.    The Debtor's Bankruptcy Proceedings**

34.    Faced with the complete and utter lack of viability of the Debtor's land in Villages 5 and 6 due to the Builders' pattern of delay and neglect, the Debtor filed a voluntary chapter 11 petition on October 26, 2009.

**FIRST CLAIM FOR RELIEF**
**(Declaratory Relief and relief under section 505(a)**
**of the Bankruptcy Code and NRS 271.010)**

35.    Plaintiff repeats and alleges each and every allegation contained in paragraphs 1 through 34 of this Complaint with the same force and effect as though fully set forth therein.

36.    This claim for relief arises under the Federal Declaratory Judgment Act (sections 2201 and 2202 of title 28 of the United States Code) because an actual and justiciable controversy exists among Plaintiffs and Defendant with regard to whether the Assessments are enforceable under Nevada law. This claim for relief also arises under section 505(a) of the Bankruptcy Code, which permits the Court to "determine the amount or legality of any tax, any fine or penalty relating to a tax whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction," and under Nevada's Consolidated Local Improvements Law — NRS 271.010 *et. seq*, including NRS 271.433, which permits the Debtor to enjoin the City's enforcement of an invalid assessment at any time and NRS 271.455, which permits the Debtor to challenge assessments if the City acts in bad faith in connection therewith.

37. LID assessments are governed by Nevada's Consolidated Local Improvements Law codified at NRS 271.010 *et seq.* Such law permits municipalities to levy special assessments on real property to pay for improvements that provide "special benefits" to such real property. Special benefits are defined as "the increase in the market value of a tract that is directly attributable to a project for which an assessment is made as determined by the local government that made the assessment." NRS 271.208. Thus, Nevada law permits a municipality to assess the cost of public improvements benefitting real property from such real property.

38. The amount of any assessment, however, is limited by Nevada law. NRS 271.365(4) provides that "[n]o assessment shall exceed the amount of the estimate of maximum special benefits to the tract assessed, as provided in subsection 2 of NRS 271.300." And, NRS 271.365(5) provides that "[n]o assessment for any one project shall exceed the reasonable market value of the tract assessed, as determined by the governing body." The Nevada Supreme Court has further interpreted these statutes and other Nevada law to provide that a special assessment is completely invalid if it provides no benefit to the assessed land. The reason is simple: LID assessments are intended to pay for infrastructure that, in essence, pays for itself by increasing the value of the property benefitted. If no infrastructure is built, no LID assessments should be collected.

39. Here, the Village Land has received no benefit from the Assessments. Indeed, it is undisputed that (a) the Inspirada project was stopped prior to the construction of any Major Infrastructure benefitting the Village Land and (b) it is unclear whether or when any such infrastructure will be built. Given the fact that there has been no special benefit bestowed upon the Village Land, there can be little question that the Assessments currently exceed the amount of special benefits received by the Village Land in violation of NRS 271.365(4). Further, without the infrastructure, the Village Land will remain largely unimproved and, depending on how and when the Inspirada project concludes, could be worth less than the Assessments, in violation of NRS 271.365(5). In addition, the City's own representative, Mr. Gomez, has indicated that the Assessments will not be enforceable if the Major Infrastructure contemplated by the LID is not built and has all but conceded that the current level of Assessments are simply

1  too high, and a reassessment that will substantially lower the Assessments for the Village Land is
2  not only required by law, but likely to occur in the future.

3  40.    Notwithstanding the fact that the Assessments are illegal under the circumstances
4  and the City's own representative has conceded as much under oath, the City has proceeded to
5  enforce the Assessments by filing a motion for relief from the automatic stay to foreclose upon
6  the Village Land. In doing so, the City has clearly acted in bad faith.

7  41.    Under these circumstances, the Assessments are both inequitable and illegal under
8  Nevada law and the Plaintiff is entitled to a declaration that (i) the Assessments are
9  unenforceable against the Debtor and (ii) the City may not foreclose upon the Village Land at
10 this time due to the unenforceable nature of the Assessments.

**SECOND CLAIM FOR RELIEF**
**(Request to Reduce Assessments)**

42.    Plaintiff repeats and alleges each and every allegation contained in paragraphs 1 through 41 of this Complaint with the same force and effect as though fully set forth therein.

43.    As noted above, section 505(a) of the Bankruptcy Code permits the Court to "determine the amount or legality of any tax, any fine or penalty relating to a tax whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction."

44.    In the event that the Court determines that the Assessments are illegal, but should not be reduced to zero, Plaintiff requests that the Court reduce the Assessments so that they comply with Nevada law, including NRS 271.208.

45.    NRS 271.208 limits the amount of any special assessment to ""the increase in the market value of a tract that is directly attributable to a project for which an assessment is made as determined by the local government that made the assessment." Here, the Major Infrastructure that was supposed to be funded with the Assessment has not been and may never be built and the value of the Village Land has not increased as a result of the Assessments. Under these circumstances, the Assessments should be dramatically reduced if not eliminated altogether.

46. The amount that the Assessments should be reduced will be established by Plaintiff at trial.

### THIRD CLAIM FOR RELIEF
### (Objection to Claim)

47. Plaintiff repeats and alleges each and every allegation contained in paragraphs 1 through 46 of this Complaint with the same force and effect as though fully set forth therein.

48. Section 502(a) of the Bankruptcy Code provides that a claim is deemed allowed unless a party in interest objects. Section 502(b) of the Bankruptcy Code provides that, in the event of such an objection, a claim is allowed, "except to the extent that such claim is unenforceable against the debtor or property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." In addition, Rule 3007(b) of the Federal Rules of Bankruptcy Procedure provides that an objection must be brought by adversary proceeding if it seeks relief obtainable only through an adversary proceeding.

49. Here, for the reasons set forth in the first claim for relief, the City's claims arising from the Assessment are not enforceable under Nevada law and, therefore, must be disallowed pursuant to section 502(b)(1). Further, the relief requested herein is proper because declaratory relief is generally sought through an adversary proceeding. As a result, Plaintiff is entitled to an order from the Court disallowing the City's claims arising from the Assessment.

50. Plaintiff also objects to the Assessments to the extent they constitute administrative claims (which the Plaintiff does not concede). As noted above, the Debtor has received absolutely no benefit from the Assessments. As a result, the Assessments do not qualify as actual and necessary costs and expenses of the estate.

//

//

//

//

- 13 -

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment as follows:

(a) In favor of Plaintiff and against the Defendant in this action;

(b) On the First Claim for Relief, for a judgment declaring that the Assessments are invalid and unenforceable and that the City may not foreclose upon the Village Land to collect the Assessments;

(c) On the Second Claim for Relief, if the Court determines that the Assessments are illegal but should not be reduced to zero, for a judgment reducing the Assessment to a level reflecting the actual benefits received by the Village Land from the infrastructure projects funded by the LID;

(d) On the Third Claim for Relief, a order disallowing all claims arising from the Assessment against the Debtor and its estate;

(e) All legal fees incurred by Plaintiff in bringing this action; and

(f) Such other and further relief as is just and proper.

Dated: March 17, 2011

Respectfully submitted,

By:  /s/ *I. Scott Bogatz*

I. SCOTT BOGATZ (NSBN 3367)
BOGATZ & ASSOCIATES, P.C.
3455 Cliff Shadows Parkway, Suite 110
Las Vegas, Nevada 89129
Telephone: (702) 776-7000
Facsimile: (702) 776-7900

ROBERTO J. KAMPFNER
(admitted *pro hac vice*)
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
Telephone:  213-620-7700
Facsimile:   213-452-2329

Attorneys for
FOCUS SOUTH GROUP, LLC

| | |
|---|---|
| 1 | GEORGANNE W. BRADLEY (NSB 1105) |
| 2 | KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO |
| 3 | 3800 Howard Hughes Pkwy., Seventh Floor<br>Las Vegas, NV  89169 |
| 4 | Telephone:    (702) 792-7000<br>Facsimile:     (702) 796-7181 |
|   | Email: gbradley@kcnvlaw.com |
| 5 | |
| 6 | Attorneys for Debtor and Debtor-in-Possession, FSG-R, LLC |